IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

A.H., by and through her Parent, K.P.,

Plaintiffs,

v.

COLONIAL SCHOOL DISTRICT,

Defendant.

Civil Action No. 1:16-cv-00726-RGA

## MEMORANDUM

Pursuant to the Individuals with Disabilities Education Act ("IDEA"), Plaintiffs, K.P., on behalf of her daughter, A.H., appeal from the decision of the Delaware Due Process Hearing Panel ("Panel"), which found Defendant's educational evaluations appropriate and denied Plaintiff's request for an Independent Educational Evaluation ("IEE") at public expense. Presently before the Court is Plaintiffs' Motion for Judgment on the Administrative Record. (D.I. 29). The issues have been fully briefed. (D.I. 30, 32, 33). For the reasons set forth below, Plaintiffs' Motion is DENIED.

### I. BACKGROUND

A.H. is an eleven-year-old girl with multiple disabilities and is eligible to receive special education and related services pursuant to the IDEA and state law. (D.I. 30 at 5). Prior to this action, A.H. was a student within Defendant Colonial School District (the "District"). (*Id.* at 7-8). This dispute arises out of Plaintiffs' disagreement with the District's Evaluation Summary

Report ("ESR")[1] of September 17, 2014 and the District's subsequent denial of Plaintiffs' request for an IEE in November 2015. (*Id.* at 9).

The ESR evaluated A.H.'s eligibility for special education services. (D.I. 18 at 41). As part of the ESR, Dr. Kristin Chickadel completed an Occupational Therapy Evaluation, which included testing of visual perception, assessment of handwriting skills, clinical and classroom observations, and consultation with teachers and other professionals. (D.I. 17 at 7). Dr. Chickadel did not complete a fine motor skills assessment as part of the Occupational Therapy Evaluation in the ESR. Dr. Chickadel had conducted an Occupational Therapy Initial Evaluation in 2013, which did assess A.H.'s fine motor skills with the Bruininks-Oseretsky Test of Motor Proficiency ("BOT-2"). (D.I. 18 at 71). The record also shows that occupational re-evaluations are typically only conducted every three years and an updated evaluation was not necessary at the time of the 2014 ESR. (D.I. 17 at 355).

The evaluation also included psychoeducational testing completed by Emily Klein, a certified school psychologist. (*Id.* at 7; D.I. 18 at 46). Ms. Klein conducted numerous standardized tests including the Stanford-Binet Intelligence Scales ("SBI"), Kaufman Test of Educational Achievement 2nd Edition ("KTEA-II"), Behavior Assessment Scale for Children – 2nd Edition ("BASC-2"), and Gilliam Asperger's Disorder Scale ("GADS"). (D.I. 18 at 46). In addition, Ms. Klein conducted student, parent, and teacher interviews, and engaged in behavioral observation and record review. (*Id.* at 46). Finally, the District conducted a Functional Behavioral Assessment ("FBA") on September 24, 2014, in anticipation of developing a

---

[1] The ESR is located at D.I. 18 at 41-59.

Behavior Intervention Plan ("BIP") to address A.H.'s problem behaviors. (*Id.* at 61-69). The FBA was conducted using the Prevent-Teach-Reinforce School-Based Checklist adopted by the Delaware Department of Education. (D.I. 17 at 275).

Plaintiffs, believing the multiple evaluations were inadequate, requested an IEE in November 2015. (*Id.* at 6). The District denied Plaintiffs' request for a publicly-funded IEE and requested a due process hearing in accordance with 14 Del. Admin. C. § 926.2.4.1.1 and 34 C.F.R. § 300.502(b)(2)(i). (D.I. 18 at 328-33).

Three panelists were appointed to the administrative due process panel. (*Id.* at 325). The Panel heard testimony from six witnesses. Dr. Kara S. Schmidt testified as an expert witness for Plaintiffs. (D.I. 17 at 73). Dr. Schmidt provided her criticisms of Defendant's testing, the tests she would have performed if she evaluated A.H., and why. (*Id.*). The District presented testimony from Ms. Klein, Dr. Chickadel, A.H.'s teacher (Stephanie Alexander), the District's Director of Student Services (John Cooper), and K.P. (D.I. 17 at 53, 229, 351, 398, 422).

On May 23, 2016, the Panel found that Defendant's evaluations met the requirements listed by the IDEA. (D.I. 17 at 10). Specifically, the Panel found that due to Ms. Klein's and Dr. Chickadel's evaluations, A.H. was eligible for both occupational therapy services and special education services under the Emotional Disturbance Classification. (*Id.* at 7). The Panel considered whether A.H. might be eligible under the Autism Classification as well, but, in light of A.H.'s history of sexual abuse and trauma, the Panel concluded that the District could not reasonably rule out A.H.'s Emotional Disturbance Classification, meaning that A.H. could not be said to meet the Autism Classification. (*Id.*) Thus, the Panel found the evaluations appropriate and that the District was not required to fund the requested IEE. (*Id.* at 10).

3

On August 19, 2016, Plaintiffs filed a complaint seeking to reverse the Panel's decision. (D.I. 1). Plaintiffs later moved for Judgment on the Administrative Record. (D.I. 29).

## II. LEGAL STANDARDS

### A. INDEPENDENT EDUCATIONAL EVALUATION

An IEE is "an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question." 34 C.F.R. § 300.502(a)(3)(i). A parent has the right to an IEE at public expense if the parent disagrees with the public agency's evaluation, subject to the following exception. *Id.* § 300.502(b)(1). After a parent requests an IEE, the public agency may file a due process complaint to request a hearing to show that its evaluation is appropriate. *Id.* § 300.502(b)(2)(i). If it is determined that the agency's evaluation is appropriate, the parent still has the right to an IEE, but not at public expense. *Id.* § 300.502(b)(3).

The IDEA imposes requirements on public agencies in conducting educational evaluations. 20 U.S.C. § 1414. These requirements are considered in determining the appropriateness of the agency's evaluation. Accordingly, in conducting an evaluation, the agency must (1) "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information," (2) "not use any single measure or assessment as the sole criterion for determining . . . an appropriate educational program," (3) "use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors." *Id.* § 1414(b)(2)(A)-(C). Additionally, the agency must, among other things, ensure that assessments are conducted "by trained and knowledgeable personnel," that "the child is assessed in all areas of suspected disability," and that "assessment tools and strategies that provide relevant information that directly assists

4

persons in determining the educational needs of the child are provided." *Id.* § 1414(b)(3)(A)-(C).

## B. STANDARD OF REVIEW

In IDEA cases, the court applies a "modified *de novo*" standard of review. *S.H. v. State-Operated Sch. Dist.*, 336 F.3d 260, 270 (3d Cir. 2003). The court may make its own findings by a preponderance of the evidence, but also must give "due weight" to the underlying administrative proceedings. *Id.* The administrative panel's factual findings are "prima facie correct" and when a reviewing court fails to adhere to those findings, it is required to explain why. *Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). Additionally, the administrative panel's credibility determinations are afforded "special weight" and the court must accept the determinations "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *Id.* (emphasis omitted). When reviewing an IDEA case, the reviewing court may not "substitute its own notions of sound educational policy for those of local school authorities." *S.H.*, 336 F.3d at 270.

## III. DISCUSSION

Plaintiffs challenge the Panel's decision finding that A.H. was not entitled to an IEE at public expense. (D.I. 29). After reviewing the extensive administrative record (D.I. 17 & 18), I find the evaluations complied with the requirements under the IDEA. Thus, I agree with the Panel's findings and determination, and conclude that A.H. is not entitled to an IEE at public expense. Accordingly, I affirm the Panel's decision and deny Plaintiffs' motion.

As a preliminary matter, Plaintiffs assert that the Panel made its decision based on improper and irrelevant considerations. (D.I. 30 at 11). Specifically, Plaintiffs allege that the panel improperly relied on considerations such as A.H.'s educational progress since the ESR was

5

conducted, K.P.'s approval of the Individualized Education Program that resulted from the ESR, and the significant amount of time that passed by the time K.P. requested an IEE at public expense. (*Id.* at 12). While I do not agree with the Panel's reliance on these factors, I need not decide whether consideration of these factors is inappropriate under the IDEA. Disregarding the factors Plaintiffs assert are irrelevant, I still come to the same conclusion as the Panel did regarding the appropriateness of the evaluations.

Plaintiffs generally assert the ESR was "inadequate" although it is unclear from the briefing which IDEA requirements Plaintiffs allege were not met. (*Id.*). Plaintiffs also argue that the District's September 24, 2014 Functional Behavioral Assessment ("FBA") was not appropriate or comprehensive. (D.I. 30 at 22). Accordingly, Plaintiffs argue the District failed to evaluate A.H. in all areas of suspected disability. (*Id.* at 16). Nevertheless, based on the requirements listed in the IDEA, I find the evaluations complied with all requirements and were appropriate in evaluating A.H.

## A. District Evaluations' Compliance with IDEA Requirements

### 1. Variety of Tools and Strategies

First, the ESR shows that Ms. Klein and Dr. Chickadel used a "variety of tools and strategies" in evaluating A.H. The ESR contained information provided by A.H.'s parent, information related to A.H.'s classroom-based assessments, and information from teacher observations and recommendations. (D.I. 18 at 41-42). Particularly, the District was provided with information about A.H.'s history, her performance on tests and in the classroom, and her problem behaviors. (*Id.*). Ms. Klein also conducted four formal assessments, interviewed the student, parent, and teachers, made behavioral observations, and conducted a record review. (*Id.* at 46). Dr. Chickadel conducted four other assessments to address A.H.'s occupational therapy

6

needs. (*Id.* at 43). Two FBAs were conducted, one in September 2014 and one in October 2015. (*Id.* at 61). The record shows the District relied on the FBAs and other behavior assessments to create a Behavior Intervention Plan containing strategies such as schedule and curriculum modifications, guidelines for developing interpersonal relationships between A.H. and teachers and peers, coping and training skills for A.H. and teachers, and planned intervention strategies to implement in a range of behaviors A.H. could display, from minor inappropriate behaviors to dangerous and disruptive tantrums. (*Id.*)

Thus, based on the number and variety of tests used and the Panel's finding that Ms. Klein and Dr. Chickadel used several tests in their evaluation, I find that the ESR used a variety of tools and strategies in compliance with the IDEA.

### 2. Avoid Reliance on a Single Measure or Criterion

Second, the record shows that the District did not rely on any "single measure" as the sole criterion for determining whether A.H. was a child with a disability. The summary and recommendations listed in the ESR show that the District relied on the assessments regarding cognitive skills, academic skills, emotional and behavioral needs, and diagnoses of behavioral and mental health conditions. (*Id.* at 53-54). In addition, the District completed two FBAs as part of a comprehensive Behavior Intervention Plan to address A.H.'s socio-behavioral challenges. (D.I. 17 at 43). The record shows the District relied on all of the assessments conducted within the ESR to make its determination that A.H. was a child with a disability, specifically, the emotional disturbance classification. (D.I. 18 at 53-54). The IDEA does not require an IEP team to complete an FBA, as long as behavior strategies are considered. *See* 34 CFR 300.320; 300.324(a)(2)(i); *C.F. ex rel. R.F. v. New York City Dept. of Educ.*, 746 F.3d 68, 80 (2d Cir. 2014). The District here, however, completed two FBAs as part of a thoroughly

7

comprehensive evaluation of A.H.'s behavioral needs. (D.I. 17 at 44-45). Thus, in accordance with the Panel's finding, I find that the District did not rely on any single measure in determining A.H.'s classification as a child with a disability under the IDEA.

### 3. Use of Technically Sound Instruments

Third, nothing in the record suggests that the evaluations completed used anything other than "technically sound instruments." At the hearing, Ms. Klein testified that her assessments were standardized and commonly used in her field. (D.I. 17 at 257, 263, 267, 269). Further, the 2014 and 2015 FBAs were conducted using the "Prevent-Teach-Reinforce" method taught by the Delaware Department of Education for these types of behavioral interventions. (*Id.* at 211). Plaintiffs do not argue that the District failed to use technically sound instruments in conducting the assessments it used for the ESR. (D.I. 30, 32). Thus, in accordance with the Panel, I find that the evaluations were completed using technically sound instruments in compliance with the IDEA.

### 4. Additional Requirements

Fourth, the evaluations meet the additional IDEA requirements for trained and knowledgeable personnel and the use of tools to provide adequate information to the IEP team. The record shows Ms. Klein and Dr. Chickadel are well-qualified and trained in their respective areas. (D.I. 18 at 6-9, 11). Ms. Klein testified that she had been working with A.H. for nearly two years at the time of evaluating her. (D.I. 17 at 233). As to whether the tools provided adequate information to the IEP team, the record shows the team used several data considerations including the evaluations in the ESR and the results of the FBA. (D.I. 18 at 76). Thus, noting that Plaintiffs do not argue otherwise, I find the District met the additional requirements.

8

## B. Evaluation in All Areas of Suspected Disability

Plaintiffs' primary argument is that the District failed to evaluate A.H. in all areas of suspected disability, which would violate 20 U.S.C. § 1414(b)(3)(B). (D.I. 30 at 16). Plaintiffs make several specific arguments in support of this primary argument. I will address each specific argument in turn, although none of the arguments is persuasive.

Plaintiffs rely on Dr. Schmidt's testimony in making these arguments regarding the deficiencies of the ESR and the FBA. (*Id.* at 16, 22). At the hearing, Dr. Schmidt testified that she would have conducted additional tests in the deficient areas of the ESR and that the FBAs were not comprehensive. (D.I. 17 at 96, 103, 109, 113, 116, 156). The Panel, however, discredited Dr. Schmidt's testimony because she had never met or observed A.H. for an evaluation. (*Id.* at 8). Plaintiffs assert that the Panel improperly weighed Dr. Schmidt's credibility and argued her evaluation of A.H. was not necessary to determine the appropriateness of the ESR. (D.I. 30 at 16). Despite this argument, "courts have cast doubt upon the relative weight of . . . experts [who perform a review of educational records] relative to school employees who actually worked with a student." *Coleman v. Pottstown Sch. Dist.*, 983 F.Supp.2d 543, 562 (E.D. Pa. 2013) (citing *Krista P. v. Manhattan Sch. Dist.*, 255 F.Supp.2d 873, 887 (N.D. Ill. 2003)). The modified *de novo* standard of review places special weight on the Panel's credibility determinations of a witness. *Shore Reg'l*, 381 F.3d at 199. In my opinion, there is no evidence, extrinsic or otherwise, in the record to justify overruling the Panel's conclusion that Dr. Schmidt's opinions about the evaluation of A.H. were less credible than the opinions of the District's witnesses. I thus agree with the Panel and give the opinions of Ms. Klein and Dr. Chickadel more weight regarding the appropriateness of the ESR and the FBAs.

Dr. Schmidt's expert testimony generally states that she would have conducted different, or more, evaluations and tests to complete A.H.'s evaluation. Although Dr. Schmidt might have conducted different tests, she and Plaintiffs fail to address how the ESR and the District's choice of evaluation tests were inappropriate in light of the requirements of the IDEA. Because Dr. Schmidt never evaluated A.H., her opinion regarding A.H.'s evaluation is less persuasive, on this record, than the opinions of the District's employees, as the Panel found. In light of the record, I agree with the Panel that "there are always additional tests that could have been chosen," but this fact alone does not support the conclusion that the ESR was not appropriate as required by the IDEA. (D.I. 17 at 9). Thus, because I find the ESR complied with the requirements under the IDEA, I affirm the Panel's conclusion that the ESR was appropriate and that Plaintiffs are not entitled to an IEE at public expense.

### 1. Neurological Evaluation

Plaintiffs argue the District failed to adequately evaluate A.H. for "educational deficits" and specifically request a neuropsychological evaluation. (D.I. 30 at 17). Plaintiffs argue that a neuropsychological evaluation would have further examined connections between A.H.'s working memory deficit and executive functioning. (*Id.*). This assertion was based on Dr. Schmidt's testimony that she believed it was necessary to understand the underlying causes of A.H.'s educational deficits. (*Id.*; D.I. 17 at 121-22). At the hearing, Ms. Klein testified that the neuropsychological evaluation was unnecessary to determine "the function of [A.H.'s] behavior" and to address her behavior in school. (D.I. 17 at 304). Ms. Klein stated that the additional test might provide "helpful background information" but was unnecessary because she already had the related information for A.H.'s behavior in the classroom. (*Id.*). Thus, although Dr. Schmidt would have conducted additional or different tests regarding A.H.'s neuropsychological needs,

Ms. Klein, with her two years of experience working with A.H., believed it was not necessary to properly evaluate A.H. Considering this, I accept the Panel's determination that a neuropsychological evaluation was not necessary to evaluate A.H. "in all areas of suspected disability."

**2. Occupational Therapy**

Plaintiffs argue that Dr. Chickadel's occupational therapy evaluation was incomplete because she only completed one formal test based on visual perception and did not evaluate A.H.'s fine motor skills. (D.I. 30 at 18). Dr. Chickadel's report included four assessment tools. (D.I. 18 at 42-43). Dr. Chickadel conducted the Developmental Test of Visual Perception—2nd edition, a Clinical Assessment of Handwriting Skills, clinical and classroom observations, and teacher consultations. (*Id.* at 43). Dr. Chickadel testified that her main concern with A.H. was the legibility of her handwriting. (D.I. 17 at 355-56). Thus, A.H. needed to be tested for both fine motor and visual perception skills. (*Id.* at 356). Dr. Chickadel also testified that she completed an initial occupational therapy evaluation of A.H. only a year earlier and that the ESR evaluation was merely an update of the earlier comprehensive occupational therapy evaluation. (*Id.* at 354-55). Noting that re-evaluations are only necessary every three years, Dr. Chickadel testified that she updated her testing to comply with the timing of the ESR, but also used information from her previous evaluation. (*Id.* at 355). Dr. Chickadel's initial evaluation included administration of the BOT-2, and her results and notes from that evaluation appear in the ESR. (D.I. 18 at 44, 71). Thus, despite Plaintiffs' assertion, the record shows the ESR included information regarding A.H.'s fine motor skills. I accept Dr. Chickadel's testimony that the fine motor skills testing did not need to be updated. Plaintiffs point to nothing else in the

11

record to support the assertion that the occupational therapy testing was inappropriate to meet the IDEA requirements.

### 3. Cognitive Functioning

Plaintiffs assert that the ESR failed to comprehensively assess A.H.'s cognitive functioning. (D.I. 30 at 19). Plaintiffs argue that the results from the District's cognitive testing showed a discrepancy between A.H.'s working memory and other cognitive domain scores, thus requiring additional testing. (*Id.*). The ESR shows that A.H.'s working memory score was "significantly lower than all of her other domain scores." (D.I. 18 at 48). The ESR also notes that the discrepancy is unusual but means that A.H. may have "significant difficulty retaining and applying information such as task directions, particularly if it is presented without visual cues." (*Id.*). Although Dr. Schmidt stated that "[t]here were no other tests done" to understand the discrepancy (D.I. 17 at 87), she failed to suggest which tests should have been completed or to suggest which suspected disability would require additional testing in the working memory domain.[2] Notwithstanding Plaintiffs' argument, the ESR noted the discrepancy and Ms. Klein considered it in making her recommendation that A.H. was a child with a disability and later in creating A.H.'s IEP. (*Id.* at 260-61; D.I. 18 at 48). Plaintiffs' argument appears to be concerned with the results of the cognitive testing and does not address why the cognitive testing failed to test A.H. "in all areas of suspected disability." Thus, considering the cognitive testing revealed a concern that the District addressed in its ESR (and the IEP), there is no basis to argue that the

---

[2] I earlier denied Plaintiff's motion to supplement the administrative record. (D.I. 25). I have reviewed the proposed supplement and conclude that the evaluation report created by Dr. Schmidt does contain suggestions of specific additional assessments to be completed (D.I. 15-1 at 16), but it does not specify which suspected disability would require additional testing for working memory. If I had granted the motion to supplement, the evaluation report would not change my conclusion.

12

testing failed to meet the IDEA's statutory requirements. Dr. Schmidt's testimony that no other tests were completed does not support the argument that the cognitive functioning tests were inappropriate. Therefore, I accept the Panel's determination finding the cognitive functioning testing appropriate.

### 4. Academic Achievement

Plaintiffs argue that the District's ESR failed to comprehensively assess A.H. for academic achievement. (D.I. 30 at 19). Dr. Schmidt testified that the reading comprehension subtest of the KTEA-2 was administered improperly and failed to assess A.H. for grade-based norms. (D.I. 17 at 102-03; D.I. 30 at 19). The record shows, however, Ms. Klein assessed A.H. on age-based norms because, at the time of the testing, A.H. was at her expected grade level. (D.I. 17 at 342-43). Although the ESR makes note that the score is based on a set of norms above the student's grade level, that is because by the time the ESR was issued, A.H. had been retained in the second grade, that is, held back a year. (*Id.*). Nevertheless, the change in circumstances after a test was administered does not support the argument that the test was inappropriate. As Plaintiffs emphasize, the time for determining an evaluation's appropriateness is the time the evaluation was performed. (D.I. 30 at 11). Ms. Klein's testimony shows that she had reason to apply the age-based norms in the reading comprehension subtest; and, because A.H. was subsequently retained, Ms. Klein noted in the ESR that the age-based norms were above A.H.'s grade level. (D.I. 17 at 342; D.I. 18 at 49). Ms. Klein also testified that although the reading comprehension score was based on a norm above her grade level, A.H.'s teacher supported the determination that reading was a strength for A.H. (D.I. 17 at 263-64). As to fluency tests, Ms. Klein testified she did not administer those tests in evaluations because she obtained the same information from the standard benchmark assessments that were conducted

13

three times a year. (*Id.* at 331-32). Thus, without further evidence showing the KTEA-2 did not appropriately assess A.H. "in all areas of suspected disability," I accept the Panel's determination that the testing in academic achievement was appropriate.

### 5. Social-Emotional Functioning

Plaintiffs assert that the ESR failed to appropriately and comprehensively examine A.H.'s social-emotional functioning. (D.I. 30 at 20). In support of this argument, Plaintiffs point to Dr. Schmidt's testimony asserting that more tests should have been conducted to evaluate A.H.'s behavioral and social skills. (*Id.* at 20; D.I. 17 at 111-13). Plaintiffs' argument is premised on the fact that the BASC-2 and the GADS evaluations were "general measures" of social-emotional functioning. (D.I. 30 at 20; D.I. 17 at 115). Ms. Klein testified that she did not conduct additional tests for autism because A.H. presented with a history of abuse and trauma. (D.I. 17 at 270-71). In Ms. Klein's professional judgment, A.H.'s emotional disturbance was perpetuating the problem behaviors and although she conducted "broad screeners" of autism and other social concerns, she could not rule out an emotional disturbance before conducting more tests related to autism only. (*Id.*). Considering Ms. Klein had spent nearly two years working with A.H., she had the opportunity to determine which tests were most appropriate to evaluate A.H. and I afford her testimony regarding A.H.'s social-emotional functioning significant weight. In further support of Ms. Klein's choice of testing, Mr. Cooper, the Director of Student Services, testified that the GADS test was the "appropriate first step" in evaluating A.H. where she presented some symptoms of autism. (*Id.* at 430-31). Mr. Cooper also noted that because the educational diagnosis of autism is precluded by the need to rule out an emotional disturbance, he "support[ed] Ms. Klein's conclusion that the balance of the clinical and testing evidence indicated that emotional disturbance was the primary educational classification." (*Id.*). Thus, I

14

accept the Panel's determination and find that the District's ESR appropriately evaluated A.H. in social-emotional functioning.

### 6. Psychiatric Assessment

Similar to the argument for a neuropsychological evaluation, Plaintiffs assert that the ESR was incomplete without a psychiatric assessment. (D.I. 30 at 21). Dr. Schmidt asserted that a psychiatric assessment was important to determine how A.H.'s mental health issues impact her at school. (D.I. 17 at 114). At the hearing, Ms. Klein testified that the psychological assessment was unnecessary to determine the function of A.H.'s behavior and to address her behavior in school.[3] (*Id.* at 303). Ms. Klein stated that the additional test would not change A.H.'s programming and placement because the program is "based on the function of her behavior" and not on a psychiatric diagnosis. (*Id.*). Thus, although Dr. Schmidt would have conducted additional or different tests regarding A.H.'s psychiatric needs, Ms. Klein, with her two years of experience working with A.H., believed she could understand the function of A.H.'s behavior without conducting a psychiatric evaluation. Considering this, I accept the Panel's determination that a psychiatric assessment was not necessary to evaluate A.H. "in all areas of suspected disability."

### 7. Classroom Observations

---

[3] Plaintiffs also note that Ms. Klein stated that she did not conduct a psychiatric assessment because one was already conducted by a third-party facility. (D.I. 30 at 20-21). Plaintiffs state that there was no evidence that the assessment was completed elsewhere and that Ms. Klein never reviewed the results. (*Id.*). However, the fact that Ms. Klein may not have reviewed a psychiatric assessment supports her testimony that a psychiatric assessment was unnecessary to understanding A.H.'s behavior in the classroom and determining whether A.H. is a child with a disability.

15

Plaintiffs also assert the ESR failed to contain classroom observations to examine the impact of A.H.'s ADHD diagnosis on her functioning in the classroom. (D.I. 30 at 21). Ms. Klein testified that she observed A.H. in the classroom on several occasions. (D.I. 17 at 253-55). The ESR included observations by A.H.'s teachers and K.P. (D.I. 18 at 52-53). Plaintiffs argue, however, that Ms. Klein's observations were not documented in the ESR and there is no indication that they were reviewed by the IEP team. (D.I. 30 at 21). According to Ms. Klein, she conducted classroom observations and there is nothing in the record discrediting her testimony. (D.I. 17 at 253-55). Thus, I accept her testimony. While the ESR contains information regarding A.H.'s classroom behavior, there is no specific section dedicated to Ms. Klein's individual classroom observations. (D.I. 18 at 41-55). Nevertheless, Ms. Klein served on A.H.'s IEP team and there is nothing to suggest that she did not consider her classroom observations or share them with the rest of the team in completing A.H.'s IEP. (*Id.* at 75). Although there was no documentation of Ms. Klein's classroom observations in the ESR, I cannot find that the District's evaluation was inappropriate based solely on a failure to document Ms. Klein's observations. Plaintiffs fail to address how documentation of the classroom observations would have made any material different to the findings and recommendations of the ESR. The lack of documentation does not mean that A.H. was not evaluated in "all areas of suspected disability." Thus, without any contradictory evidence, I accept the Panel's determination that the ESR was appropriate regarding the use of classroom observations.

### 8. FBA

Plaintiffs' final argument is that the 2014 and 2015 FBAs were not sufficiently comprehensive nor fully completed. (D.I. 30 at 22). Ms. Klein testified that she conducted multiple interviews with A.H., her mother, and her teacher, observed A.H. in the classroom

16

multiple times, as well as used the "Prevent-Teach-Reinforce" assessment from the Delaware Department of Education as part of the FBA. (D.I. 17 at 273-74). The FBAs were two assessments of multiple behavior assessments used to address A.H.'s behavioral challenges with a Behavior Intervention Plan. (D.I. 32 at 20). Plaintiffs contend that the FBAs were not thorough or well-documented and thus the District must pay to have an independent FBA conducted. (D.I. 30 at 24). The IDEA, however, does not require an FBA to be written, or completed at all as part of a comprehensive evaluation. *D.K. v. Abington School Dist.*, 969 F.3d 233, 251 (3d Cir. 2012). The District argues the FBAs were thoroughly comprehensive and used to successfully implement the Behavior Intervention Plan. (D.I. 32 at 20). I agree. Even if the FBAs were found to be inadequate, however, an FBA is not required under the IDEA, and the District has demonstrated through other assessments that A.H.'s behavioral challenges were evaluated. (D.I. 18 at 51-53). Thus, I accept the Panel's determination that the District does not need to fund an additional independent FBA.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Judgment on the Administrative Record is **DENIED** and the Panel's order denying Plaintiffs' request for an IEE at public expense, and an award of attorney's fees and costs, is **AFFIRMED**.

An appropriate order will be entered.

United States District Judge